UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BALFOUR BEATTY INFRASTRUCTURE, INC., <br><br> Plaintiff, <br><br> v. <br><br> PB&A, INC., <br><br> Defendant. | Case No. 16-cv-01152-WHO <br><br> **ORDER GRANTING IN PART AND DENYING IN PART NON-PARTY URS'S MOTION FOR SANCTIONS** <br><br> Re: Dkt. No. 74 |

## INTRODUCTION

Non-party URS Corporation moves for sanctions against defendant PB&A, Inc., seeking its costs of production in response to PB&A's document subpoena, travel costs, and attorneys' fees for bringing its motion. Motion for Sanctions ("Mot.") (Dkt. No. 74). The motion is GRANTED in part and DENIED in part. PB&A shall reimburse URS for $383.46 in travel costs resulting from the untimely cancelled deposition. The remainder of URS's requested sanctions, however, is denied.

## BACKGROUND

On June 20, 2016, PB&A served a subpoena for document production on URS, requesting 12 categories of documents related to PB&A's work on the Transbay Transit Center (the "Project"), the earlier state court action and Dispute Resolution Board ("DRB") proceeding, and other aspects of the Project. Declaration of Marion T. Hack (Dkt. No. 74) ¶ 2, Ex. 1. On August 16, 2016, PB&A also served a subpoena to depose URS employee Steve Brokken on September 29, 2016. Hack Decl. ¶ 11, Ex. 6.

In July 2016, URS served objections to the document subpoena and engaged in discussions with PB&A to narrow the subpoena's scope. Hack Decl. ¶¶ 4-5, Exs. 2, 3. On August 9, 2016, PB&A stated that production could be limited to 2011, 2012, and 2013, and clarified its

involvement in the Project. Hack Decl., Ex. 3. On October 18, 2016, URS's counsel indicated that she hoped to complete production by October 31, 2016, and asked PB&A's counsel to send some dates in November for Brokken's deposition. Opposition (Dkt. No. 68), Ex. C at 2.

URS and PB&A disagreed, however, over the production of approximately 30 handwritten notebooks created by Brokken. Hack Decl. ¶¶ 6-7, Ex. 4. The notebooks contained information on several different projects, including the Project at issue here. *Id.* ¶ 8. URS's counsel "repeatedly notified PB&A's counsel that detailed review of these notebooks would be required to ensure that only references to the Project were produced, and that either privileged or confidential business information was not inadvertently produced." *Id.*

To reduce costs of production, PB&A's counsel suggested that Brokken tab the relevant notebook pages so that only those pages would be produced to PB&A, and alternatively offered to enter into a protective order regarding the notebooks. Hack Decl., Ex. 5 at 4.[1] URS's counsel rejected both of these options: Brokken did not have the time to tab the documents, and URS would not agree to a protective order. *Id.* at 3. URS also requested that PB&A pay $6,000 for the production of the notebooks, but PB&A refused, objecting that the cost was unreasonable because it was based on an attorney's rate of $250 per hour and suggesting that the work was more appropriate for a paralegal at a lower billing rate. *Id.*; Hack Decl., Ex. 7 at 4-5.

URS was unable to meet its October 31, 2016 estimated date of production. On November 2, 2016, URS indicated that it was getting the documents together and that it was willing to provide the relevant notebooks if PB&A agreed to pay for half the costs under a paralegal rate of $180 per hour. *Id.* at 3. Based on the time spent in review thus far, URS estimated 20 hours to review 21 notebooks within the requested date range, resulting in $3,600 costs. *Id.* URS requested that PB&A pay $1,800. *Id.* PB&A also refused to pay this amount.

URS's counsel attests that, on an unknown date, PB&A's counsel and URS's counsel agreed over the phone to reset Brokken's deposition for November 30, 2016. Hack Decl. ¶ 12. As a result, URS's counsel purchased plane tickets and made hotel reservations in San Francisco for

---

[1] Citations to exhibits containing emails refer to the ECF-generated page number.

that deposition. *Id.* ¶ 15.  PB&A's counsel declares that "PB&A indicated that it would be available to take Steven Brokken's deposition on November 30, 2016, based upon Attorney Hack's representation that URS would complete document production by October 31, 2016." Declaration of Todd J. Stalmack (Dkt. No. 86-8) ¶ 3.

On November 7, 2016, PB&A's counsel emailed URS, stating, "We still have not received any documents and this has put us in a tight spot given the court's case management order, Brokken's dep date and the deps of the experts."  Hack Decl., Ex. 7 at 3.  URS then produced all documents except for the Brokken notebooks on November 8, 9, and 15, 2016, totaling at least 42,000 pages.  Hack Decl. ¶ 6, Ex. 4.  PB&A's counsel declares that "the vast majority" of the documents produced by URS "were not limited to the time frame of 2011-2013 and/or PB&A's design of the interior bracing and access trestle."  Stalmack Decl. ¶ 2.

On November 23, 2016, PB&A's counsel told URS that it still needed Brokken's notebooks and requested that they be produced by December 2, 2016.  Hack Decl., Ex. 8 at 3. URS produced approximately 50 pages of Brokken's notebooks on November 29, 2016, and its privilege log the following day.  Hack Decl., Ex. 4.  On November 29, 2016, URS's counsel Marion Hack "called PB&A's counsel to verify the deposition location, and was for the first time told that the November 30, 2016, deposition was cancelled."  Hack Decl. ¶ 16.  At this time, Hack and URS's in-house counsel were on their way to the airport.  *Id.*  Hack emailed PB&A's counsel stating that she had to cancel the travel plans and that PB&A should pay for the travel cancellation fees.   She also asserted that there was no need to cancel the deposition because PB&A had all of URS's production except for 50 pages, and noted that URS would be filing a motion for costs. Hack Decl., Ex. 8.

URS's counsel attests that "[a]t no time did PB&A's counsel ever indicate that the November 30, 2016, deposition was not going forward," and PB&A's counsel never "stated that the production of the notebook documents would cause the deposition to be rescheduled."  Hack Decl. ¶¶ 13-14.  PB&A's counsel avers that "PB&A did not confirm [Brokken's] November 30, 2016 deposition because URS had promised to produce the documents prior to the two previously subpoenaed deposition dates and failed to produce any documents." Stalmack Decl. ¶ 4.

3

On January 5, 2017, URS sent PB&A its proposed motion for costs and sanctions, requesting payment of $28,693.22 by January 31, 2017. Oppo., Ex. H. On February 1, 2017, URS filed this motion for sanctions, seeking reimbursement for $25,309.76 in costs and fees resulting from its discussions with PB&A's counsel, document review, and document production in relation to PB&A's document subpoena. Hack Decl. ¶ 20. It also seeks reimbursement of non-refundable travel and hotel costs of $383.46. *Id.* Lastly, URS requests attorneys' fees of $3,645.00 for filing its motion. *Id.* ¶ 21.

## DISCUSSION

URS moves for sanctions against PB&A under Federal Rules of Civil Procedure 45(d)(3)(C)(ii)[2] and 45(d)(1). PB&A argues that sanctions are unwarranted, and provides that URS and Brokken possess information "critical" to PB&A's defenses in this action. Oppo. at 1.

### A.     Mandatory Cost Shifting under Rule 45

Federal Rule of Civil Procedure 45 governs discovery from nonparties by subpoena. Pursuant to Rule 45(a)(1)(D), a party may serve a subpoena commanding a nonparty to produce materials. "Rule 45(d)(2)(B)(ii) requires the district court to shift a non-party's costs of compliance with a subpoena, if those costs are significant." *Legal Voice v. Stormans Inc.*, 738 F.3d 1178, 1184 (9th Cir. 2013). "[W]hen discovery is ordered against a non-party, the only question before the court in considering whether to shift costs is whether the subpoena imposes significant expense on the non-party. If so, the district court must order the party seeking discovery to bear at least enough of the cost of compliance to render the remainder 'non-significant.'" *Id.*

"[N]either the Federal Rules nor the Ninth Circuit has defined 'significant expenses,' which is a term that readily lends itself to myriad interpretations depending on the circumstances

---

[2] Although URS cites Rule 45(d)(3)(C)(ii), it relies only on cases discussing mandatory cost shifting under Rule 45(d)(2)(B)(ii). Rule 45(d)(3)(C) provides that in circumstances permitting (but not requiring) a court to quash or modify a subpoena, "the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party: (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and (ii) ensures that the subpoenaed person will be reasonably compensated."

4

of a particular case." *United States v. McGraw-Hill Companies, Inc.*, 302 F.R.D. 532, 536 (C.D. Cal. 2014). Courts look to the nonparty's financial ability to bear the costs of production. *Id.* "[A]n expense might be 'significant,' for instance, to a small family-run business, while being 'insignificant' to a global financial institution." *Id.*

Courts also consider whether the nonparty has an interest in the outcome of the underlying case. *Cornell v. Columbus McKinnon Corp.*, No. 13-cv-02188-SI, 2015 WL 4747260, at *3, 5 (N.D. Cal. Aug. 11, 2015). Rule 45's cost-shifting provision "was not intended as a mechanism for entities which stand to benefit from certain litigation outcomes to evade discovery costs arising from their involvement in the underlying acts that gave rise to the lawsuit." *Id.* at *5 (citing *Tutor–Saliba Corp. v. United States*, 32 Fed. Cl. 609, 610, nt. 5 (1995) (noting that the nonparty at issue, unlike many nonparties, was "substantially involved in the underlying transaction and could have anticipated that [its involvement might] reasonably spawn some litigation, and discovery")). Additionally, the nonparty seeking cost shifting must demonstrate that its costs are reasonable and resulted from compliance with the subpoena. *McGraw-Hill Companies, Inc.*, 302 F.R.D. at 536 ("Rule 45 does not cut a blank check to non-parties—unnecessary or unduly expensive services do not 'result from compliance' and, therefore, do not count as 'expenses.'").

I must determine whether URS's costs of $25,309.76, which resulted from its discussions with PB&A's counsel, document review, and document production in relation to PB&A's document subpoena, are significant and must be shifted. Hack Decl. ¶ 20. First, the parties dispute whether URS has the financial ability to bear the costs of production. In *Cornell*, the court found that FedEx's status as a large multinational corporation ranked on the Fortune 500 and recorded net income of $2.57 billion in 2015 weighed in favor of finding that discovery costs of $227,597 were insignificant. 2015 WL 4747260, at *4 n.3 (noting FedEx's claimed costs were only about 1% of its profit). FedEx's ability to bear the costs of discovery, in combination with its interest in the outcome to the litigation, led the court to deny its motion for costs. *Id.* at *5. By way of comparison, another court has summarized decisions involving other types of nonparties:

> The D.C. Circuit "had no trouble concluding that" estimated expenses of nearly $200,000 were significant for the Defense Department, the State Department, and the CIA. *See [Linder v. Calero-Porocarrero,* 251 F.3d 178, 179–80, 182–83 (D.C. Cir.

> 2001)]. The Ninth Circuit had "no trouble concluding that $20,000 is 'significant' " for a non-profit legal advocacy group. *See Legal Voice*, 738 F.3d at 1181, 1185. In a case cited by both the Ninth and D.C. Circuits, a district court held that $9,000 might be "significant" for two attorneys. *See Williams v. City of Dallas*, 178 F.R.D. 103, 113–14 (N.D.Tex.1998).

*McGraw-Hill Companies, Inc.,* 302 F.R.D. at 536; *see also Nitsch v. Dreamworks Animation SKG Inc.*, No. 14-cv-04062-LHK, 2017 WL 930809, at *1,4 (N.D. Cal. Mar. 9, 2017) (Lloyd, J.) (finding $67,787.30 significant for a nonparty consulting company after reviewing its financial information under seal).

      PB&A asserts that URS is publicly traded on the New York Stock Exchange and had revenue over $17.4 billion in 2016. Oppo. at 4. Although URS emphasizes that PB&A failed to provide evidentiary support for this assertion, URS remains silent on its ability to bear the financial cost of production. *See Hyundai Motor Am., Inc. v. Pinnacle Grp.*, LLC, No. 14-cv-0576, 2016 WL 6208313, at *2 (C.D. Cal. Apr. 20, 2016) (denying motion to shift costs where nonparty was not entirely disinterested and failed to provide any financial information that would enable the court to find that the requested costs were significant). I recognize that a nonparty's financial status "is not dispositive in every instance," but here URS has not provided any basis for me to determine that it is not financially able to bear the entirety of the costs of production. *Cornell*, 2015 WL 4747260, at *4.

      URS also argues that considering a nonparty's purported wealth "would encourage abusive discovery tactics against non-parties in direct violation of Rule 45's purpose." Reply at 4-5. I disagree. A non-party has various methods to protect itself from such abuses. For instance, it could bring a motion to quash or modify an overly broad or otherwise improper subpoena, and it could seek sanctions for subpoenas issued with an improper purpose under Rule 45(d)(1), as discussed below. Therefore, this concern does not prevent me from looking to a nonparty's ability to bear the costs of production as one factor in determining whether costs are "significant."

      Second, there is no evidence that URS has a financial interest in the outcome of this case. However, URS perhaps is not in the typical position of a completely uninterested nonparty, as it was purportedly involved "in the underlying acts that gave rise to the lawsuit." *Cornell*, 2015 WL 4747260, at *5. For instance, plaintiff Balfour Beatty Infrastructure, Inc., bases its claims against

6

PB&A in part on PB&A's alleged failure to properly design the access trestle on the Project. Complaint (Dkt. No. 1) ¶¶ 31-32. PB&A asserts, however, that the Project owner "hired URS and Brokken as consulting engineers to review design submittals to ensure compliance with the contractual specifications" and that "Brokken was the engineer who reviewed and required PB&A to revise and resubmit its design of the temporary access trestle[.]" Oppo. at 1.

Third, it is not clear that all of URS's costs of production resulted from compliance with the subpoena. *See McGraw-Hill Companies, Inc.*, 302 F.R.D. at 536. PB&A's counsel declares that he "reviewed over 45,000 pages of documents produced by URS and the vast majority of these documents were not limited to the time frame of 2011-2013 and/or PB&A's design of the interior bracing and access trestle." Stalmack Decl. ¶ 2. Therefore, it appears that a significant portion of URS's production was not responsive to the narrowed scope of the subpoena.

For all these reasons, I find that URS's costs are not significant and that cost-shifting is not required.

### B. Discretionary Sanctions under Rule 45

A nonparty may also seek sanctions pursuant to Rule 45(d)(1), which provides:

> A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction--which may include lost earnings and reasonable attorney's fees--on a party or attorney who fails to comply.

Unlike Rule 45(d)(2)(B)(ii), sanctions pursuant to Rule 45(d)(1) are discretionary. *Legal Voice*, 738 F.3d at 1185. "[W]hile failure narrowly to tailor a subpoena may be a ground for sanctions, the district court need not impose sanctions every time it finds a subpoena overbroad; such overbreadth may sometimes result from normal advocacy, which we have said should not give rise to sanctions." *Id.* (internal citations omitted). But a court can "impose sanctions when a party issues a subpoena in bad faith, for an improper purpose, or in a manner inconsistent with existing law." *Id.*

URS argues that an award of sanctions under Rule 45(d)(1) is appropriate because PB&A violated its duty to avoid imposing an undue burden. Mot. at 8. Although the subpoena contained

7

12 categories of documents, most without limiting time frames, PB&A's counsel engaged in discussions with URS's former and current counsel to narrow the subpoena, resulting in a scope limited to 2011-2013 and with more definite terms. This narrowed scope was not unduly burdensome. Therefore, URS is not entitled to sanctions for its costs related to the production that occurred on November 8, 9, and 15, 2016.

PB&A also requested information contained in Brokken's handwritten notebooks, which URS produced on November 29, 2016. Although the notebooks contained confidential information relating to several other projects, PB&A suggested ways to reduce the burden on URS, including having Brokken tab the relevant pages and offering to enter into a protective order. URS, however, rejected these options. Also, while URS's counsel had to separate out the confidential information, this discovery is highly relevant and needed for PB&A's defenses, given URS's purported involvement in reviewing PB&A's designs. Indeed, handwritten notes are often more useful than carefully crafted documents. In light of the relevance of these documents and PB&A's attempts to minimize the burden from production, I find that the production of the notebooks was not unduly burdensome and that URS is not entitled to these costs.

However, PB&A's belated cancellation of the November 30, 2016, deposition did impose an undue expense to URS. Although PB&A asserts that it never confirmed the deposition date in an email or issued an amended subpoena, it presents no evidence to contradict URS's counsel's statement that they agreed to November 30, 2016 for the deposition. PB&A, therefore, had a responsibility to timely inform URS's counsel when it determined that it could not take Brokken's deposition on the agreed upon date. Also, PB&A asserts that it agreed to the deposition date based on URS's representation that it would complete discovery by October 31, 2016, but there is no evidence that it ever articulated to URS that the deposition would not go forward if production was not timely completed. And PB&A had received all but 50 pages from the notebooks and a privilege log by November 15, 2016—two weeks before the scheduled deposition. Hack Decl. ¶ 6. Cancelling just one day before the deposition, without any explanation as to why PB&A's counsel could not have done so sooner, is not timely and imposed an undue expense on URS as a

8

1  nonparty.  Accordingly, URS's request for its non-refundable travel fees of $383.46 is GRANED.

2  Hack Decl. ¶ 20.

3  Lastly, URS requests that I award $3,645.00 in attorneys' fees for litigating this motion.

4  This request is denied.

## CONCLUSION

6  URS's motion for costs is GRANTED in part and DENIED in part.  PB&A shall reimburse

7  URS for its travel costs resulting from the cancelled Brokken deposition of $383.46 within thirty

8  days of the date of this Order.  The remainder of URS's motion is DENIED.

9  **IT IS SO ORDERED.**

10  Dated: March 13, 2017



William H. Orrick
United States District Judge