UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| BALFOUR BEATTY INFRASTRUCTURE, INC., | Case No. 16-cv-01152-WHO |
|---|---|
| Plaintiff, | **ORDER DENYING PB&A'S MOTION FOR SUMMARY JUDGMENT RE BALFOUR BEATTY'S CONTRACT CLAIMS AND GRANTING PB&A'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY RE PB&A'S COUNTER-CLAIM** |
| v. | |
| PB&A, INC., | |
| Defendant. | |
| | Dkt. No. 109 |

**INTRODUCTION**

This case involves disputes arising out of construction of the Transbay Transit Center in San Francisco. Balfour Beatty Infrastructure Inc. ("BBII") has brought claims against PB&A, Inc., for breach of contract. PB&A argues that BBII's claims should be dismissed under the doctrine of judicial estoppel because BBII took clearly inconsistent positions in prior litigation with other parties involved in the Transbay project and should not be permitted to change its position now. Alternatively, it argues that under California Code of Civil Procedure section 877 it may offset the $20 million in settlement awards that BBII received, through mediation with other parties involved in the Transbay construction project, against the $18 million in damages BBII claims in this case. Since the offset amount is greater than BBII's potential damages against PB&A, PB&A argues that BBII's claims should be dismissed. For the reasons outlined below, PB&A's arguments are not convincing: PB&A has failed to demonstrate that BBII took a clearly inconsistent position in the prior litigation and section 877 is not applicable to the contract claims brought against PB&A. PB&A's motion for summary judgment on BBII's contract claims is DENIED.

PB&A also moves for summary judgment on its counter-claim for approximately $100,000 in unpaid fees against BBII. There is no material dispute that BBII has not paid PB&A all of the fees owed under the contract between the parties. However, since BBII may be entitled to set off these damages if it succeeds on its claims against PB&A, whether PB&A is entitled to any damages cannot yet be determined. PB&A's motion for summary judgment on its counter-claim is GRANTED with regard to liability. The damages on PB&A's claim will be determined at trial.

**BACKGROUND**

**A.     Transbay Transit Center**

The Transbay Transit Center is a transit hub and development project located in downtown San Francisco developed by the Transbay Joint Powers Authority ("TJPA"). The architect for the Center was Pelli Clark Pelli Architects ("PCPA"). PCPA contracted with Arup North America ("ARUP") to be the Engineer of Record for the overall project. TJPA retained URS to peer review the project's design and retained Webcor/Obayashi Joint Venture ("WOJV") to be the general contractor for the project. Given the large scope of the project, WOJV divided construction of the Center into major scopes of work. The first scope of work was the Buttress, Shoring, and Excavation ("BSE") package which required a prospective subcontractor to design and build the Internal Bracing to prevent movement of the Cement Deep Soil Mix ("CDSM") Wall that formed the perimeter of the project site during construction and to design and build an Access Trestle to allow access to the work site.

In August 2010, PB&A contacted BBII to offer its services to be BBII's designer and engineer of record on a bid for the BSE package. Oppo. Ex. B3 at 14:8-14 (Dkt. No. 119-4). On August 16, 2010, BBII provided PB&A with the prime contract specifications for the Internal Bracing and Access Trestle and asked PB&A to prepare preliminary designs for these elements. Mot. Ex. E. (Dkt. No. 110-8); Oppo. Ex. B4 (Dkt. No. 119-5). BBII's project engineer, Gardner, used some of PB&A's design work and incorporated it into his preliminary designs in preparing BBII's bid. Mot. Ex. D at 91:1-93:1, 99:2-4 (Dkt. No. 110-7). PB&A accompanied BBII during an initial meet and greet with TJPA, WOJV, and San Francisco to discuss the design concepts. Mot. Ex. G, ¶3 (Dkt. No. 110-10). BBII won the BSE bid and contracted with PB&A to complete

2

the design-build elements. BBII Oppo. Ex. B1 at 37:3 – 38:2; 62:3-17. PB&A was BBII's Engineer of Record on the project. *Id.*

### B. Internal Bracing

PB&A prepared its interior bracing design, relying on the specifications prepared by URS and ARUP. Mot. Ex. H at 17:5-18:10; Brokken Dep. Tr., Mot. Ex. I at 36:12-14. BBII submitted PB&A's Internal Bracing design to WOJV on April 22, 2011 and it was accepted and approved on June 2, 2011. Mot. Ex. J. After excavation and installation of the Internal Bracing system in Zone 1 began, the CDSM wall began to leak and move more than was permitted under the contract. WOJV and TJPA made various claims why the wall might be moving, including that there was a flaw in the bracing design. Mot. Ex. K at 2; Ex. A at 1-6. BBII responded to this claim by noting that it had limited knowledge regarding a potential flaw in the bracing design as it did not design the CDSM wall, but highlighted that "all of the loading requirements are specified in the contract documents and BBII's approved bracing design utilized these loads as directed in the contract" and that "at no point throughout the submittal and approval process for the Internal Bracing did BBII receive comments regarding this issue." Mot. Ex. L (Dkt. No. 110-15). WOJV and TJPA directed BBII to mitigate the wall movement in Zone 1 and re-design the Internal Bracing system for Zone 4 by connecting the walers and making the walers continuous. Mot. Ex. M; Oppo. Ex. B9 at 31:23-33:16 (Dkt. No. 119-10). BBII resolved the issues in Zone 1 by connecting the CDSM wall soldier piles. Oppo. Ex. B3 (Dkt. No. 119-4). PB&A re-designed the Internal Bracing wall for Zone 4 per WOJV and TJPA's instructions, which resolved the movement issue. Oppo. Ex. B9 at 31:23-33:16.

### C. Access Trestle

The Access Trestle Specification provided by TJPA incorporated a seismic criteria included in the bridge design which stated that "design loads shall include design for an earthquake corresponding to a ground motion with a 10% probability of exceedance in 50 years (475-year earthquake)." Oppo. Ex. B36 (Dkt. No. 119-35). BBII and PB&A's initial design for the Access Trestle was not able to meet this seismic requirement. Because the design did not meet the seismic requirements of the specification, during construction TJPA rejected the Access

3

Trestle design and BBII and PB&A were required to revise and redesign the Access Trestle. Oppo. Ex. B12; Ex. B11 (Dkt. No. 119-13; 119-12).

### D. Contractual Claims Process

The prime contract on the Transbay project included a claims process whereby BBII had a limited time to submit any Change Order Request ("COR") to preserve the right to seek additional money and contractual payments related to an "occurrence." Oppo. Ex. B13 at 36 (Dkt. No. 119-14). With the advice and cooperation of PB&A, BBII submitted CORs and claims to WOJV and TJPA regarding extra costs incurred in resolving the issues with the Internal Bracing, Oppo. Ex. B6 at 70:9-72:9, and submitted a COR and claim with regard to costs incurred redesigning the Access Trestle design, Oppo. Ex. B6 at 45:22-47:16. In making these claims BBII took the position that BBII's and PB&A's Internal Bracing design met the contractual specifications, Mot. Ex. N at 2, and that the TJPA had required BBII to revise its Access Trestle design beyond the clear requirements of the contract. BBII certified that each of these claims was made in good faith and was accurate to the best of BBII's knowledge. Mot. Ex. Q (Dkt. No. 110-19; 110-20). PB&A in turn certified the substantive basis of these claims to BBII. Oppo. B14 (Dkt. No. 119-15).

### E. DND Action

On October 23, 2012, DND Construction ("DND"), a subcontractor for BBII who built the CDSM wall, filed suit against BBII in Superior Court for the County of San Francisco seeking unpaid construction costs associated with building the CDSM wall. Oppo. Ex. B15 (Dkt. No. 119-16). BBII filed a cross-complaint against WOJV for the same amounts claimed by DND and for declaratory action against TJPA. Oppo. B17 (Dkt. No. 119-18). It also brought claims against WOJV based on the unresolved certified claims. *Id.* WOJV filed a cross-complaint against BBII asserting that BBII's claims against WOJV should be asserted as pass-through claims against TJPA. Oppo. Ex. B18 (Dkt. No. 119-19). Given the number of claims and legal issues, WOJV and TJPA decided to try to resolve the claims through an alternative dispute resolution process with the Disputes Review Board ("DRB"). Oppo. Ex. B7. Because a DRB was not part of the original prime contract, it took WOJV and TJPA some time to revise the prime contract to provide for a DRB. *Id.* Neither BBII nor DND was a party to the DRB Agreement reached between

WOJV and TJPA but BBII was allowed to participate in selecting a DRB panel. Oppo. Ex. B19 (Dkt. No. 119-20). All the parties agreed to stay the DND litigation to focus on the DRB proceedings and the case was stayed on May 22, 2013. Oppo. Ex. B20; Ex. B21 (Dkt. No 119-21; 119-22).

### F. DRB Process

The DRB Process was voluntary, the DRB's recommendations were to be non-binding, any recommendations from the DRB regarding CDSM wall movement were agreed to be non-admissible in any future proceedings and attorneys were not permitted to speak. Oppo. Ex. B19. BBII and PB&A worked together to prepare written materials and presentations to be made at the DRB proceeding. Oppo. Ex. B7 at 103:22-104:20; 108:2-109:1. PB&A was required to assist BBII in this process per the parties' Professional Services Agreement ("PSA"), which states at section 2.3.11 that "Engineer shall advise the trade contractor (BBII) and prepare to serve as a witness in connection with any dispute resolution procedure set forth in the Contract or any other public hearing, arbitration or legal proceeding relating in any way to Engineer's services." Oppo. Ex. B2 ¶ 2.3.11 (Dkt. No. 119-3). BBII directed PB&A not to communicate with TJPA or WOJV because the PSA required PB&A to route any communications directed at TJPA or WOJV through BBII. Oppo. Ex. B2 ¶ 2.1.3.

The DRB met on November 13-14, 2013 to hear presentations regarding various aspects of the Transbay project, including the CDSM wall movement. Oppo. Ex. B7 at 78:18-23. At the DRB, Gardner, from BBII, and VAK, an expert BBII had retained, made presentations regarding the CDSM wall movement. Mot. Ex. BB at 111:21-113:3. PB&A's representative, Qing Liu, also participated in the process and was asked questions regarding the CDSM wall following Gardner's presentation. Oppo. Ex. B9 at 64:3-66:14. The DRB issued a recommendation regarding the CDSM wall movement on February 14, 2014, concluding that BBII was not entitled to additional compensation for the Zone 1 and Zone 4 re-designs and that PB&A's Internal Bracing design had failed to prevent CDSM wall movement. Oppo. Ex B7 at 70:17-71:8. BBII rejected the DRB recommendation and withdrew from the DRB process. Oppo. Ex. B22 (Dkt. No. 119-23).

5

### G. PB&A Tolling Agreement

Following BBII's withdrawal from the DRB proceedings it sent PB&A a proposed tolling agreement to preserve claims it had against PB&A. Oppo. Ex. B23 (Dkt. No. 119-24). PB&A retained counsel who proposed a Common Interest Agreement that included a tolling provision. Oppo. Ex. B24 (Dkt. No. 119-25). This Agreement acknowledged, "Although the undersigned Counsel and their respective Clients believe that there may be certain areas in which they presently or in the future may have divergent or opposing positions, there is a mutuality of interest in a common and joint prosecution and defense of the claims, investigations or proceedings arising out of the Project." Oppo. Ex. B26 (Dkt. No. 119-27). PB&A signed this agreement in May, 2014.

### H. Renewed Litigation, Mediation, and Settlement

After BBII withdrew from the DRB, it proposed mediation to WOJV and TJPA. Oppo. Ex. B22. In preparation for the mediation, BBII retained a forensic accounting firm to assist in verifying BBII's claims and cost data. Oppo. Ex. B28 at 40:15-41:7. Its forensic accountant produced a preliminary report to WOJV and TJPA on May 30, 2014 and an interim report on July 31, 2014. Oppo. Ex. B39; B30 (Dkt. No. 119-30). The report included an initial claims list consisting of forty-three claims unique to BBII totaling $35,594,167. Oppo. Ex. B30 at 2.

While the parties were preparing for mediation, the DND action remained stayed. On September 14, 2014, a second BBII subcontractor, Becho, brought suit against BBII in Santa Clara Superior Court. Oppo. Ex. B31. Becho alleged $13,696,399.95 in claims against BBII. *Id.*

TJPA, WOJV, BBII, and ARUP had their first mediation from October 6-7, 2014. Oppo. Ex. B33 (Dkt. No. 119-33). Becho and DND were not parties to this mediation but BBII included the value of the subcontractors' claims in its total asserted claims; the mediation was intended to "settle all of BBII's claims against TJPA, WOJV and ARUP related to the Transbay Project, including those set forth in the California State Court litigation." Mot. Ex. OO. In total, BBII claimed $57 million against WOJV and TJPA. *See* Oppo. Ex. B30; B31; B16. TJPA, WOJV, BBII, and ARUP were not able to reach a settlement during the October 6-7, 2014 mediation. Oppo. Ex. B33.

On October 31, 2014 the stipulated stay on the DND action expired and the stay was lifted. Oppo. Ex. B37. The parties then engaged in some limited discovery. BBII issued written discovery requests to WOJV and TJPA and noticed depositions for the persons most knowledgeable from each regarding the CDSM wall movement and Access Trestle issues. Mot. Ex. HH. It also issued subpoenas to ARUP, Turner Construction, and URS for documents related to design of the CDSM wall and Access Trestle. Mot. Ex. II. However, no depositions occurred and WOJV answered only three interrogatory requests. Oppo. Ex. B37 ¶16. In December, 2014, BBII moved to transfer the Becho action to San Francisco Superior Court and consolidate it with the DND litigation. Mot. Ex. KK. In support of the motion to transfer, BBII's attorney stated, "The Santa Clara Action is the only other pending case regarding the disputes between TJPA, WOJV, Balfour Beatty, Becho and DND. Other lawsuits are not foreseeable at this time because the project disputes are largely encompassed by the existing claims." Mot. Ex. YY.

After a second mediation on January 14, 2015, TJPA, WOJV, BBII, ARUP, and PCPA reached a settlement agreement in which BBII recovered $20 million in damages. Oppo. Ex. B37 ¶19. The settlement was not presented to the court in the DND proceeding and neither DND nor Becho were parties to the settlement. Oppo. Ex. B37 ¶9.

On January 21, 2015, the DND court granted BBII's motion to transfer and consolidate. Mot. Ex. NN. Prior to the consolidation, no discovery had occurred in the Becho action. Oppo. Ex. B37 ¶17. The consolidated DND and Becho action was finally dismissed on September 29, 2015 after additional settlement agreements were reached with DND and Becho. *Id.* ¶20. No discovery occurred in the consolidated action from January 14, 2015 – September 29, 2015. *Id.* ¶19.

**I.    Suit Against PB&A**

In August, 2015, BBII issued a demand letter to PB&A claiming $18 million in damages arising out of PB&A's alleged design errors and omissions. Mot. Ex. QQ. PB&A counter-claimed for unpaid fees totaling approximately $100,000. Dkt. No. 18. This lawsuit followed.

**LEGAL STANDARD**

Summary judgment on a claim or defense is appropriate "if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 257 (1986).

On summary judgment, the Court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979).

## DISCUSSION

### I. EQUITABLE ESTOPPEL

PB&A contends that the court should dismiss BBII's claims against it under the equitable doctrine of judicial estoppel. Mot. at 16. This argument has no merit.

Judicial estoppel is an equitable remedy designed to "protect the integrity of the judicial process" and prohibit a party from unfairly benefitting from taking inconsistent positions in subsequent judicial proceedings. *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). It may be applied "when a party's inconsistent behavior would otherwise result in a miscarriage of justice." *Montrose Medical Grp. Participating Savings Plan v. Bulger*, 242 F.3d 773 (3d Cir. 2001). In *New Hampshire v. Maine*, the Supreme Court laid out the factors a court should consider in deciding whether to apply judicial estoppel.

> First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier

8

> position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled. Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determination, and thus poses little threat to judicial integrity. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*New Hampshire*, 532 U.S. at 750-51 (internal quotations omitted).

### A. Whether BBII's Position is Inconsistent with Prior Litigation

Under the *New Hampshire* factors the court first considers whether a party's later position is "clearly inconsistent with its earlier position." An inconsistency can be factual or legal. *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1133 (9th Cir. 2012). However, "judicial estoppel is reserved for more egregious conduct than just threshold inconsistency." *Gen. Signal Corp. v. MCI Telecom. Corp.*, 66 F.3d 1500, 1505 (9th Cir. 1995) (internal quotation marks omitted).

PB&A argues that BBII's position in this case is clearly inconsistent from the position it took in the prior state court litigation, in the DRB proceedings, and in making certified claims to WOJV. It highlights that BBII previously brought claims against WOJV, asserting that WOJV was at fault for the movement in the CDSM wall because there were design flaws and ambiguities in the prime contract and brought claims arguing that there were ambiguities in the specification for the Access Trestle. It notes that it did not admit any fault on the part of BBII and PB&A in bringing these claims. Further, it did not plead in the alternative against PB&A or invite PB&A to participate in the settlement mediation among WOJV, TJPA, ARUP, PCPA, and BBII. PB&A also points out that in support of its motion to consolidate the Becho and DND litigations, BBII stated that "[o]ther lawsuits are not foreseeable at this time." None of these arguments is convincing.

BBII's position in the prior litigation is fully reconcilable with its position in this case because its theories of liability against WOJV and PB&A are completely different. In the prior litigation, BBII argued that the specifications in the prime contract were ambiguous and that WOJV made design errors that contributed to the movement of the CDSM wall. Here it argues that PB&A failed to alert BBII about potential ambiguities in the WOJV specifications and made

9

United States District Court
Northern District of California

1 design errors of its own. It is entirely possible that both of these things are true. That BBII did not
2 concede flaws in BBII's and PB&A's designs in its suit against WOJV does not mean its position
3 was inconsistent: whether there were flaws in PB&A's designs does not impact whether there
4 were ambiguities in WOJV's specifications or flaws in WOJV's designs. This fact issue did not
5 have a direct bearing on whether WOJV had any liability to BBII.

6 The language PB&A cites to demonstrate that BBII made "clearly inconsistent" statements
7 illustrates the weaknesses in PB&A's argument. PB&A notes that in the WOJV suit, BBII stated
8 that "W/O has contended that the cracks, leaks, and movement are the result of . . . BBII's design
9 for the temporary bracing system. However, the cracks, leaks and movement are the result of
10 design errors, omissions and inconsistencies included, but not limited to, the design selection of
11 the type of wall system to be used for the Project." Mot. Ex. 110-30 ¶99. This language barely
12 addresses PB&A's designs and makes no definitive statement about them, instead focusing on
13 WOJV's potential liability to BBII. This avoidance and deflection is hardly even a statement
14 about PB&A's designs, let alone a clearly inconsistent one. PB&A functionally argues that BBII
15 was obligated to affirmatively admit failures in BBII's and PB&A's designs in its suit against
16 WOJV, even though the issue was ancillary to BBII's claims against WOJV, in order to preserve
17 claims against PB&A. The law does not require plaintiffs to make such concessions.

18 PB&A also points to BBII's statement in its motion to consolidate in the *Becho* case that
19 "[o]ther lawsuits are not foreseeable at this time." Even if this cropped quote accurately reflected
20 BBII's statement, it would have no bearing on the judicial estoppel argument because it is
21 irrelevant to the merits of the claims. But PB&A's quote is highly misleading; BBII's full
22 statement was that "[t]he Santa Clara Action is the only other pending case regarding the disputes
23 *between TJPA, WOJV, Balfour Beatty, Becho and DND.* Other lawsuits are not foreseeable at this
24 time because the project disputes are largely encompassed by the existing claims." Dkt. No 110-
25 46 at 17 (emphasis added). BBII's statement that other actions among TJPA, WOJV, BBII,
26 Becho, and DND were not foreseeable is not inconsistent with it later bringing suit against PB&A.

27 The cases PB&A cites in support of its judicial estoppel claim are easily distinguished. In
28 *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1133 (9th Cir. 2012) the Ninth Circuit

10

concluded that a plaintiff was judicially estopped where she had previously argued that, due to a physical impairment, she was required to use a scooter or wheelchair for mobility but subsequently argued that her impairment required her to use a Segway and that she had never used a wheelchair. Because the plaintiff had reached favorable settlements based specifically on her need to use a wheelchair, and these statements "were not peripheral or immaterial," the court concluded that she could not assert contrary claims in subsequent suits. *Id.* Unlike in *Baughman*, BBII has not made clearly inconsistent statements. Further, any prior statements BBII made in support of the PB&A designs were peripheral to its claims against WOJV.

In *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001) the Ninth Circuit applied judicial estoppel where a plaintiff "clearly asserted inconsistent positions" because he "failed to list his claims against State Farm as assets on his bankruptcy schedules, and then later sued State Farm on the same claims." The court explained that judicial estoppel was necessary in this case to "protect the integrity of the bankruptcy process" which "impose[s] upon the bankruptcy debtors an express, affirmative duty to disclose all assets, *including contingent and unliquidated claims*." *Id.* at 785 (internal citations omitted)(emphasis in original). By failing to disclose his potential claim against State Farm, the plaintiff had breached an affirmative duty to the bankruptcy court and was judicially estopped from later pursuing that claim. *Id. Hamilton* is not analogous to the facts here. BBII did not have any affirmative obligation to admit faults in the PB&A designs in the prior litigation and has not taken a clearly inconsistent position in this case.

In *Gagne v. Zodiac Maritime Agencies*, 274 F. Supp. 2d 1144, 1148 (S.D. Cal. 2003), a plaintiff who had previously sued a container ship named the *APL Korea* for negligently passing it, and who had reached a settlement with that ship, brought the same claims against a second ship, the *Santa Cruz*. Because there was no factual dispute that only one ship had passed plaintiffs' ship and that the *APL Korea* and *Santa Cruz* could not both be at fault, the court applied judicial estoppel, holding that plaintiff could not "have it both ways." *Id.* at 1146. This is clearly distinguishable from the case here where it is entirely possible that both WOJV and PB&A are liable to BBII under different factual theories.

Unlike the cases PB&A relies on, the facts here do not demonstrate that BBII has played

11

"fast and loose with the courts." *Hamilton*, 270 F.3d 782. BBII previously brought contract claims against WOJV alleging that WOJV's ambiguous specifications and design flaws required BBII to spend significant sums making new designs and making changes to the Internal Bracing and Access Trestle. It now brings separate contract claims against PB&A alleging that because PB&A failed to alert BBII to these ambiguities and because of PB&A's design flaws, BBII was required to spend significant sums resolving the Internal Bracing problems and redesigning the Access Trestle. BBII's claims against WOJV and PB&A are not mutually exclusive – both WOJV and PB&A could bear some fault in causing BBII's claimed damages. BBII has not taken clearly inconsistent positions and judicial estoppel is not appropriate.

### B. Whether BBII convinced a court to accept its position

PB&A argues that BBII convinced a court to accept its position because it reached a favorable settlement with WOJV. *See Baughman*, 685 F.3d at 1133 ("For a court to be misled, it need not itself adopt the statement; those who induce their opponents to surrender have prevailed as surely as persons who induce the judge to grant summary judgment."). While a favorable settlement may support the application of judicial estoppel, because PB&A has failed to show that BBII's statements were clearly inconsistent, BBII's settlement with WOJV does not.

### C. Whether BBII Obtained an Unfair Advantage

PB&A argues that BBII obtained an unfair advantage because it was able to obtain "free discovery" regarding PB&A's designs while PB&A was helping BBII pursue its certified claims against WOJV. It also argues that BBII poorly defended PB&A's designs in the DRB proceeding, to PB&A's detriment, because the unfavorable result from the DRB proceeding "may have contributed to BBII securing less in settlement, and now suing PB&A as a result." These arguments are not persuasive.

First, PB&A was contractually required to assist BBII in pursuing its certified claims against BBII. To the extent PB&A is arguing that BBII lulled it into participating in this process by defending PB&A's designs, this argument is contradicted by PB&A's clear contractual duty to participate. Though PB&A asserts that it was misled by BBII, it does not explain how its participation in the DRB would have been different if it fully understood the potential conflicts

12

between it and BBII. It still would have been contractually obligated to assist BBII in the DRB and to prepare to act as a witness. While BBII may have acquired some information from PB&A while the parties worked together, PB&A voluntarily agreed to this arrangement by signing the PSA.

PB&A later reaffirmed its assent to a "joint prosecution" arrangement with BBII when it drafted and signed the Common Interest Agreement. *See* Oppo. Ex. B26. The Common Interest Agreement undermines PB&A's claim that BBII pulled a bait and switch by first defending PB&A's designs and then later suing PB&A. The Common Interest Agreement makes clear that PB&A and BBII understood that they could have claims against each other but that they also had an interest in first pursuing BBII's claims against WOJV in which the parties had a common interest. *Id.* ("Although the undersigned Counsel and their respective Clients believe that there may be certain areas in which they presently or in the future may have divergent or opposing positions, there is a mutuality of interest in a common and joint prosecution and defense of the claims, investigations or proceedings arising out of the Project."). BBII did not obtain any unfair advantage by holding PB&A to its contractual obligation to assist in pursuing the certified contract claims.

PB&A's second argument, that PB&A suffered an unfair detriment as a result of BBII's poor defense of its designs, undermines its entire judicial estoppel theory. PB&A does not argue that it has been unfairly harmed because BBII defended PB&A's designs and now asserts a different position against it. Instead, it argues that it has been harmed because BBII did not defend PB&A's designs forcefully enough and suggests that BBII should have allowed it to take a larger role in the DRB proceedings. This argument reveals PB&A's understanding that by defending PB&A's designs in the DRB and in bringing claims against WOJV, BBII was taking a position favorable to PB&A. The more money BBII could recover from WOJV, the less money it would possibly seek from PB&A. This is, after all, why the parties had a Common Interest Agreement – they had a common interest in a joint prosecution against WOJV. Had BBII not defended PB&A's designs in pursuing its contract claims against WOJV, then it is possible it would have received an even lower settlement and would be seeking even larger damages from PB&A.

1   PB&A has failed to identify any harm caused by BBII taking "inconsistent positions." In fact, it
2   has demonstrated that it could only have benefitted from BBII defending its designs in pursuing
3   claims against WOJV. PB&A's allegation that BBII did a bad job of defending its designs does
4   not show that PB&A faces an unfair detriment as a result of BBII's "inconsistent" positions.

5   PB&A has failed to show that judicial estoppel is appropriate. BBII did not take a clearly
6   inconsistent position in its prior disputes with WOJV, ARUP, TJPA, Becho, DND, and PCPA.
7   Further, PB&A has not demonstrated any unfair detriment resulting from BBII's positions in the
8   prior litigation: if anything, PB&A's arguments show that it may have benefitted from BBII's
9   defense of its designs. PB&A's request to dismiss BBII's claims under judicial estoppel is
10  DENIED.

## II. CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 887

PB&A argues summary judgment is appropriate because it is entitled to set off the $20 million BBII received in the settlement with WOJV, TJPA, and ARUP against the $18 million in claims BBII brings in this case under section 877 of California's Code of Civil Procedure. This argument fails because section 877, which applies to joint tortfeasors, does not apply to this contract case.

Section 877 states, "Where a release, dismissal, with or without prejudice, or a covenant not to sue or enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort, or to one or more co-obligors mutually subject to contribution rights, it shall have the following effect: (a) it shall not discharge any other such party from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it, whichever is the greater." Cal. Code. Civ. P. § 877.

Section 877 applies only to joint tortfeasors or co-obligors on a single contract; it does not apply to all multiple wrongdoers. *Tiffin Motorhomes, Inc. v. Superior Court*, 202 Cal. App. 4th 24, 31-32 (Cal. Ct. App. 2011) (defendants who plaintiff alleged had breached two separate warranty agreements were not joint tortfeasors under section 877 because plaintiff's claims were based in contract, not in tort). "Had the Legislature intended section 877.6 to apply to *any*

multiple wrongdoers, it could have said so. It did not." *Id.* at 32. Where a plaintiff brings claims only for breach of contract and the defendant is not a co-obligor, section 877 does not apply. *S.E.C. v. Medical Capital Holdings, Inc.*, No. SA CV 09-0818 DOC (RNBx), 2013 WL 3776279, at *5 (C.D. Cal. July 17, 2013). This does not change if those contract claims allege negligent conduct or otherwise "sound in tort." *Id.* "[A]n allegation of '*negligent* conduct in breaching the contract' does not change the distinction between contract and tort." *Id.*

PB&A argues that it is a joint tortfeasor because BBII's contract claims against PB&A, and its contract claims against WOJV, sound in tort. This argument is precluded by *Tiffin* and *S.E.C.*, which make clear that it does not matter whether contract claims "sound in tort" for the purposes of section 877. *See Tiffin*, 202 Cal. App. 4th at 31-32; *S.E.C.*, 2013 WL 3776279, at *5. Without a clear explanation or citation, PB&A attempts to distinguish *Tiffin* and *S.E.C.* by highlighting that they involved "allegations of breach of unrelated contracts" and the plaintiffs sought only contract remedies. Reply at 11. These "distinctions" fail; the same is true in this case as BBII brought breach of contract claims against WOJV and PB&A based on separate contracts and now seeks only contractual remedies against PB&A. Just as in *S.E.C.*, that some of BBII's contract claims against PB&A "sound in tort" does not change the section 877 analysis.

PB&A also argues that section 877 applies to contract claims when they are "essentially claims for indemnity." Reply at 11. This argument is not supported by the case law. Although California courts have held that "a party may not avoid a section 877.6 motion by providing different labels for what are in reality indemnity or contribution claims" this rule still only applies to joint tortfeasors, it does not apply to contractual indemnity claims. *Gackstetter v. Frawley*, 135 Cal. App. 4th 1257, 1274 (Cal. Ct. App. 2006); *Cal-Jones Properties v. Evans Pac. Corp.*, 216 Cal. App. 3d 324, 328 (Cal. Ct. App. 1989)("Section 877.6 provides that a good faith settlement bars *other joint tortfeasors* from any further claims of indemnity or contribution against the settling tortfeasor.")(emphasis added).

PB&A is not a joint tortfeasor with WOJV, TJPA, and ARUP. BBII brought contract claims against those entities and brings separate contract claims against PB&A. Section 877.6 does not apply to these claims.

### III. PB&A'S CROSS-CLAIM FOR $100,000 IN DAMAGES

PB&A argues that it is entitled to summary judgment on its contract claim against BBII for approximately $100,000 in unpaid fees. Mot. at 26. It asserts that there is a valid contract between PB&A and BBII and that BBII failed to pay PB&A for a portion of the work under the contract. PB&A asserts that these damages are either $106,358 (per PB&A's records) or $108,251.16 (per BBII's records); Mot. Ex. RR at 48-49; Ex. SS; Ex. PP at 59-60; Ex. UU. It seeks summary judgment that BBII is liable on this contract.

BBII does not dispute that there is a valid contract and that it has not paid PB&A all of its fees under the contract. It argues that summary judgment is not appropriate because BBII is entitled to set off PB&A's damages from its own, which far exceed PB&A's.

While BBII is entitled to set off PB&A's damages from its own, *see Eistrat v. Humiston*, 160 Cal. App. 2d 89, 91 (Cal. Ct. App. 1958), a possible setoff does not impact its liability to PB&A. BBII admits that it owes PB&A approximately $100,000 in unpaid fees. PB&A's motion for summary judgment on its counter-claim is GRANTED with regard to liability. PB&A's exact damages and whether BBII will be entitled to set off these damages will be resolved at trial.

### CONCLUSION

PB&A has failed to demonstrate that judicial estoppel applied to this case or that section 877 allows it to offset BBII's past settlement awards. PB&A's motion for summary judgment on BBII's contract claims is DENIED. PB&A's motion for summary judgment on the liability issue of its counter-claim for damages against BBII is GRANTED. The damages on this claim will be decided at trial.

**IT IS SO ORDERED.**

Dated: May 4, 2017

William H. Orrick
United States District Judge